UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICK MUNOZ, | Case No.: 1:16-cv-01103 JLT BAK (BAM) |
| Plaintiff, | ORDER DENYING IN PART DEFENDANTS' REVIVED MOTION FOR SUMMARY JUDGMENT |
| v. | |
| CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, et al., | (Doc. 58) |
| Defendants. | |

Rick Munoz asserts he is disabled as defined by the Americans with Disabilities Act and Rehabilitation Act. Munoz reports that while he was in the custody of the California Department of Corrections and Rehabilitation, he had a chrono that required housing on a low bunk bed due to his disabilities. He contends the chrono was wrongfully revoked by a physician, after which he was injured while trying to use an upper bunk. Munoz sought to hold the physician, Dr. Janina Meissner-Frisk, liable for violating his civil rights, the ADA, the Rehabilitation Act, and negligence. In addition, Munoz sought to hold the CDCR liable for violating the ADA and Rehabilitation Act. (*See generally* Doc. 7.)

Defendants moved for summary judgment on all claims. (Doc. 58.) The Court granted the motion as to the claims arising under federal law and declined supplemental jurisdiction over the remaining state law claim, which was dismissed. (Doc. 65.) Following an appeal by Munoz regarding

his ADA and Rehabilitation Act claim only, the Ninth Circuit remanded the matter for Court to apply a different legal standard to determine whether Munoz had a qualifying disability. (Doc. 80.)

The Court considered the original papers (Docs. 58, 61-63), the Ninth Circuit's opinion (Doc. 80), and briefs of the parties following remand (Docs. 87-88, 92). The original motion was taken under submission pursuant to Local Rule 230(g). (*See* Doc. 60 at 3.) The Court again finds oral arguments are not necessary, and the motion remains under submission. For the reasons set forth below, summary adjudication of the claim arising under the ADA and Rehabilitation Act is **DENIED**. In addition, the Court now reinstates and examines the negligence claim, for which summary adjudication is **DENIED**.

## I.   Background

The Court restates, as necessary, the facts as summarized in its order regarding the motion dated October 9, 2019. (*See* Doc. 65.) In addition, the Court has incorporated findings by the Ninth Circuit and facts referenced in its remand order.

### A.   Relevant Facts

Munoz's incarceration relevant to this action spanned from 2009 until 2016, at which time he was paroled. (*See* Doc. 58-4 at 206, 233.) Prior to this period of incarceration at Valley State Prison, according to his self-reported medical history and record evidence, Munoz had surgeries for various knee problems in 2000, 2008, and 2009.[1] (*See* Doc. 58-3 at 134; Doc. 61-2 at 4, ¶ 2.) Munoz contends his "knees have never completely recovered from the injuries and surgeries." (Doc. 61-2 at 4, ¶ 2.)

Munoz informed the CDCR that he had "suffered knee pain for the prior three years, and that [his] knees occasionally lock up" in October 2012. (Doc. 61-2 at 5, ¶ 5.) Munoz received his first

---

[1] Previously, the Court observed: "The timeframe of Plaintiff's *right* knee surgery is inconsistent throughout the record." (Doc. 65 at 2, n.1, emphasis added.) The Court noted: "No records from the surgery itself are in the record evidence, and references to the surgery in Plaintiff's subsequent medical records are all self-reported by Plaintiff. The Court finds it reasonable to infer that the surgery did not occur in 2008 or 2009 for the simple reason that Plaintiff's left knee surgery records from those years are in the record evidence." (*Id.*) Although Munoz reported in an affidavit that his right knee surgery occurred in 2005, the Court concluded the right knee surgery occurred in 2000 based upon medical records from November 2001, at which time Munoz informed a physician "he had right knee surgery in October 2000, due to 'messed up cartilage.'" (*Id.*, quoting Doc. 58-3 at 134.)

In the briefing following remand, Munoz suggests the Court previously overlooked medical records and "dismisses Munoz's history of knee surgery." (Doc. 88 at 4.) In support of this assertion, Munoz directs the Court's attention to "[r]ecords from the surgeries [found] in… Doc. 61-2 at 11-20." (*Id.*) The records cited by Munoz clearly relate to the surgery on his *left* knee, while the Court was addressing the *right* knee surgical history. (*See* Doc. 61-2 at 11-20.) Regardless, the specific dates of the surgeries are not material to the Court's analysis.

2

medically approved accommodation chrono temporarily assigning him to a lower bunk bed from Dr. Zhang in August 2013. (Doc. 58-3 at 296.) The same chrono indicated Munoz required a right knee brace temporarily. (*Id.*) The lower bunk chrono was renewed three times by various healthcare providers. (Doc. 58-4 at 21, 58, 88.) In January 2015, Dr. K. Toor indicated in the chrono that Munoz should have a bottom bunk and left knee brace permanently. (*Id.* at 88.)

In July 2015, the CDCR requested review by healthcare staff of the lower bunk chronos issued to inmates not listed on the *Armstrong* Disability Placement Plan, to ensure the compliance with established medical criteria.[2,3] (Doc. 58-3 at 99; Doc. 58-6 at 3, ¶ 8.) Munoz was on the list of inmates for whom the chronos were to be reviewed at the request of the CDCR. (Doc. 58-6 at 3, ¶ 8.) Defendant Janina Meissner-Frisk, D.O., a healthcare provider at Valley State Prison, reviewed the chrono for Munoz, and she rescinded it on July 31, 2015. (*Id.*)

It is undisputed that Dr. Meissner-Frisk did not examine Plaintiff's knees prior to revoking the chrono, and she did not conduct a patient interview regarding his knees. (Doc. 58-6 at 3, ¶ 8; *see also* Doc. 80 at 5.) Instead, Dr. Meissner-Frisk "reviewed Plaintiff's Unit Health Records to determine whether his low bunk chrono was medically necessary" and indicated she relied upon this review, prior examinations, and observations of Munoz. (*Id.*) In addition, as the Ninth Circuit noted:

> [Dr. Meissner-Frisk] testified that a medical doctor would want to conduct a physical exam before deciding whether to grant or rescind a low-bunk chrono. She also testified that she relied on medical records to make her decision, which were the same records that prior physicians used to grant Munoz's chrono. The medical records were filled with many references to serious knee injuries, prior knee surgeries, and knee pain. The medical records reflected X-rays that described Munoz's knees as "normal," yet Dr. Meissner-Frisk and Munoz's expert, Dr. Bruce Ellison, both opined that X-rays were not certain to reveal the type of knee injuries of which Munoz complained.

(Doc. 80 at 5; *see also* Doc. 61-2 at 118, 144.)

---

[2] The *Armstrong* Remedial Plan is a remedial order issued in relation to a still-pending prisoner class action, *Armstrong v. Brown*, No. 4:94-cv-02307-CW (N.D. Cal.), filed in 1994, in which the plaintiffs seek CDCR compliance with the ADA and Rehabilitation Act. The order requires CDCR to implement its Disability Placement Plan, which encompasses the policies and procedures intended to ensure nondiscrimination against inmates with disabilities.

[3] Munoz objected to Defendants' references to the *Armstrong* case as irrelevant and hearsay. The Court overruled the objections (Doc. 65 at 2, n.3) and its prior rulings on the objections stand. The allegations and orders in *Armstrong* are properly the subject of judicial notice, and the Court took judicial notice of such information to the extent addressed herein. (*See id.; see also Mullis v. U.S. Bank. Ct.*, 828 F.2d 1385, 1388 n.9 (9th Cir. 1987); *Hott v. City of San Jose*, 92 F. Supp. 2d 996, 998 (N.D. Cal. 2000) (taking judicial notice of the filings of another court).

On August 1, 2015—the next day after the chrono was rescinded—Munoz reported to the prison's medical staff that "his knee locked up" while climbing to his upper bunk, resulting in a fall and injury to the right knee. (Doc. 58-4 at 121.) Munoz reported "severe right knee pain" and he was "unable to walk even a short distance due to pain," though medical records from the incident also indicate no visible bruising, redness, or swelling. (*Id.*) Munoz was issued a temporary chrono for a low bunk for one week, received crutches and a prescription for pain medication, and instructed to follow up with medical staff. (*Id*. at 120, 122.) In addition, an x-ray was ordered on the right knee, which Dr. Meissner-Frisk later noted was "completely normal." (*Id.* at 124, 128.)

Dr. Meissner-Frisk met with Munoz during one of his follow-up visits on August 19, 2015. (Doc. 58-4 at 128.) At this appointment, she requested authorization for an MRI and ordered a right knee brace. (*Id.* at 128-129.) Dr. Meissner-Frisk reinstated the permanent chrono for a bottom bunk. (*Id.* at 128, 130.) She also indicated Munoz should use stairs on only a limited basis. (*Id.* at 130.)

Munoz underwent the MRI for his right knee on September 28, 2015, and the results were reviewed with him on October 5, 2015. (Doc. 61-2 at 57; Doc. 58-4 at 135.) Munoz was informed the MRI indicated an "ACL tear and medial and lateral menisci tears." (Doc. 58-4 at 135.) Munoz was referred to an orthopedic surgeon, Dr. Craig Lovett, who saw him on December 22, 2015. (*Id.* at 135-137, 162; Doc. 61-2 at 62-64.) Dr. Lovett contradicted the findings of the radiologist in reviewing an MRI— which he indicated was dated November 23, 2015— asserting there was no ACL tear and only a medial meniscus tear that was likely the result of Plaintiff's previous surgery. (Doc. 61-2 at 63.) He advised Munoz to use a knee brace, take anti-inflammatories, and to follow up in six-months' time. (*Id.* at 64.) Munoz contends the orthopedic surgeon reviewed the wrong MRI and instead viewed the later-taken MRI of his left knee from November 23, 2015, rather than his right knee. (Doc. 7 at 9, ¶¶ 46-47; *see also* Doc. 61-2 at 58.)

Munoz was paroled in May 2016, before he could be seen for a six-month follow up examination with the orthopedic surgeon. (Doc. 58-4 at 233-235; Doc. 61-2 at 14.) Sometime after his release, Munoz began working as an electrician. (*See id.* at 246-248.) He injured his right knee while at a job site on January 6, 2017. (*Id.*) Medical records from the consultations indicate a suspected partial ACL tear and sprain characterized as work-related from the January 2017 incident. (*Id.* at 275,

295-297.) The records also indicate Munoz denied prior relevant injury or surgeries to his right knee, such as stemming from the reported upper bunk fall. (*Id.* at 275, 279.) An orthopedist recommended a course of physical therapy. (*Id.* at 297.)

### B. Procedural History

On July 29, 2016, Munoz filed a complaint against the CDCR and Dr. Janina Meissner-Frisk. (Doc. 1.) Munoz filed his Second Amended Complaint on March 23, 2017, which became the operative pleading in the action. (Doc. 7.) In the Second Amended Complaint, Munoz sought to hold both Defendants liable for violations of the ADA and the Rehabilitation Act. (*See* Doc. 7 at 15-18.) In addition, Munoz asserted claims against Dr. Meissner-Frisk for violations of his civil rights arising under 42 U.S.C. § 1983 and negligence under state law. (*Id.* at 7-18.)

Defendants filed a motion for summary judgment on July 19, 2019. (Doc. 58.) Munoz filed his opposition on August 13, 2019 (Doc. 61) to which Defendants filed a reply on August 23, 2019 (Doc. 63). The Court issued a memorandum decision and order granting summary adjudication of the two claims arising under federal law. (Doc. 65.) The Court declined to exercise jurisdiction over the remaining state law claim, and dismissed the claim. (*Id.*) Munoz appealed the decision as it related to his second cause of action for violation of the ADA, but did not appeal the decision related to his claim under Section 1983. (Doc. 71; Doc. 80 at 1-2.)

The Ninth Circuit reversed the decision related to the ADA claim in an opinion issued on January 7, 2021. (Doc. 80.) The Ninth Circuit found the Court erred in the standard applied "to conclude that Munoz did not have a qualifying disability within the meaning of the ADA." (*Id.* at 2.) The Ninth Circuit also rejected Defendants' alternative arguments that they were entitled to summary judgment on grounds not reached by the district court. (*Id.* at 3.) Specifically, the Court concluded "Defendants are … not entitled to summary judgment on the issue of whether they discriminated against Munoz by reason of his disability." (*Id.* at 4.) Further, the Ninth Circuit opined: "Defendants are likewise not entitled to summary judgment as to whether they exhibited deliberate indifference," because "[t]he evidence presented by Munoz creates a triable issue of fact as to whether Dr. Meissner-Frisk conducted an adequate 'fact-specific' inquiry into Munoz's disability." (*Id.* at 5.) The Ninth Circuit reversed the decision and remanded the action for the Court "to apply the proper standard to the

question of whether Munoz has a qualifying disability." (*Id.* at 3.)  The judgment of the Court took effect on January 29, 2021.  (Doc. 83.)

Following the remand, the Court ordered the parties to provide additional briefing, addressing whether Defendants were entitled to summary judgment on the issue of whether Munoz has a qualifying disability.  (Doc. 84.)  Defendants filed their remand brief on April 12, 2021.  (Doc. 87.)  Munoz filed his brief in opposition on April 28, 2021 (Doc. 88), to which Defendants filed a reply on July 16, 2021 (Doc. 92).

## II. Legal Standards for Summary Judgment

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim.  *Id.*; *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim…") (internal quotation marks, citation omitted).

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment, or summary adjudication of a claim, should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact.  *Id.,* 477 U.S. at 323.  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).  A party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories,

and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact. Fed R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586. An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 587. The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. *Id.* at 586 n.11; Fed. R. Civ. P. 56(c). Further, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). In resolving a motion for summary judgment, the Court can only consider admissible evidence. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). Further, evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr*, 285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

### III. Evidentiary Objections

When evaluating a motion for summary judgment, the court "cannot rely on irrelevant facts, and thus relevance objections are redundant." *Burch v. Regents of the Univ. of Cal.,* 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). Likewise, "improper legal conclusions ... are not facts and likewise will not be considered on a motion for summary judgment." *Id.* Accordingly, the Court relied only upon any evidence it deems admissible in evaluating the merits of the motion for summary judgment.

///

## IV. Discussion and Analysis

Defendants sought summary judgment on all claims in the action, and maintain summary adjudication of Munoz's claim under the ADA and Rehabilitation Act ("RA") is appropriate following the remand by the Ninth Circuit. (Docs. 58, 87.)

### A. Violation of Section 1983

As noted above, Munoz alleged Dr. Meissner-Frisk violated his right to medical care under Section 1983. (Doc. 7 at 12.) The Court granted summary adjudication of this claim, and the decision was not appealed by Plaintiff. (*See* Doc. 65 at 5-13, 19; Doc. 80 at 1-2.) Accordingly, the prior ruling related to the first cause of action is undisturbed.

### B. Violations of the ADA and Rehabilitation Act

Munoz contends the CDCR and Dr. Meissner-Frisk are liable for violations of Title II of the ADA and Section 504 of the RA, which prohibit discrimination on the basis of disability and may require accommodation for an individual's disability. (*See* Doc. 7 at 15-16.) The Ninth Circuit explained that "[t]he ADA applies only to public entities, whereas the RA proscribes discrimination in all federally-funded programs." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). Thus, both the ADA and RA apply to inmates in California state prisons. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998) (the ADA "unmistakeably includes State prisons and prisoners within its coverage"); *Armstrong v. Wilson*, 124 F.3d 1019, 1023 (9th Cir. 1997) ("the ADA and RA apply to inmates and parolees in the state correctional system"); *Armstrong v. Davis*, 275 F.3d 849, 962 n.17 (9th Cir. 2001) (noting the California prison system receives "federal financial assistance").

The ADA provides in relevant part: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides: "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

In general, to succeed on a claim a violation of Title II of the ADA, a plaintiff must establish

that "(1) [he] is a qualified individual with a disability; (2) [he] was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities, and (3) such exclusion or discrimination was by reason of [his] disability." *Lovell*, 303 F.3d 1052; *see also Cohen v. City of Culver City,* 754 F.3d 690, 695 (9th Cir. 2014).  Because "[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act…, courts have applied the same analysis to claims brought under both statutes." *Zukle v. Regents of the Univ. of California*, 166 F.3d 1041, 1045 (9th Cir. 1999).[4]

The Ninth Circuit also determined that "[t]o recover monetary damages under Title II of the ADA or the Rehabilitation Act,"—as Munoz seeks (Doc. 7 at 19)— a plaintiff must show "intentional discrimination on the part of the defendant."  *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (2001) (citing *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998)).  This requires a plaintiff to establish the defendant was "deliberately indifferent" to his disability, which "requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that the likelihood." *Id.* at 1139 (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1988)).

Defendants seek summary adjudication of the claim under the ADA and RA arguing Munoz is unable to succeed on his claim because he "did not suffer from a qualifying disability, he was not denied participation in services, programs, and activities, and exclusion from a[] low-bunk was not by reason of his disability."  (Doc. 58-1 at 2; *see also id.* at 7, 10-11.)

### 1. Disability under the ADA

To bring a successful claim, "a plaintiff must first prove that he is disabled" within the meaning of the statute.  *Higley v. Rick's Floor Covering, Inc.*, 400 Fed. App'x 244, 245 (9th Cir. 2010).  The ADA indicates: "The term 'disability' means, with respect to an individual — (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).  "Whether a person is disabled under the ADA is an 'individualized inquiry.'" *Thornton v. McClatchy Newspapers, Inc.*, 261 F3d 789, 794 (9th Cir. 2001) (quoting *Sutton v. United Air Lines,*

---

[4] For this reason, the Court again refers only to the ADA standards in its analysis for the sake of simplicity.  (*See* Doc. 65 at 16, n. 6.)

*Inc.*, 527 U.S. 471, 483 (1999)).

"At the summary judgment stage, 'precedent does not require comparative or medical evidence to establish a genuine issue of material fact regarding the impairment of a major life activity.'" *Rohr v. Salt River Project Agric. Improvement & Power Dist.*, 555 F.3d 850, 858-59 (9th Cir. 2009) (quoting *Head v. Glacier Northwest Inc.*, 413 F.3d 1053, 1058 (9th Cir. 2005)). Rather, the Ninth Circuit determined "a plaintiff's testimony may suffice to establish a genuine issue of material fact." *Id.* For an affidavit alone to support the finding of disability under the ADA, however, it "must not be merely self-serving and must contain sufficient detail to convey the existence of an impairment." *Id.*

      *a.*    *Impairment and duration*

Munoz asserts he "is disabled with a chronic knee derangement," which required "multiple operations on his knees." (Doc. 61 at 8.) In an affidavit, Munoz reports he had "a history of chronic knee problems that began in 2000," and his "knees have never completely recovered from the injuries and surgeries." (Doc. 61-2 at 4, ¶ 2.) For example, Munoz reports his "knees lock up in certain circumstances, including while climbing." (*Id.*) In addition, he asserts that due to his condition, he received knee braces during his incarceration and "was not permitted to work on December 15, 2014 due to the condition of [his] knees...." (*Id.* at 5, ¶¶ 9, 11.) Munoz's affidavit is consistent with statements made to treatment providers at Valley State Prison, and as well as the chronos indicating knee braces were issued to Munoz. (*See, e.g.,* Doc. 61-2 at 5; Doc. 58-3 at 296 [chrono indicating Munoz was issued a right knee brace for six months in August 2013]; Doc. 58-4 at 40-41, 44 [records indicating Munoz had a history of chronic bilateral knee pain and was using a knee brace following a fall after his "knee went out" in June 2014]; *id.* at 88 [chrono from January 2015 indicating Munoz should have a left knee brace permanently].)

Defendants argue Munoz identified only "temporary conditions or isolated occurrences," and such "conditions do not describe a 'disability' under the ADA." (Doc. 87 at 4, emphasis omitted.) Defendants assert that "[t]emporary, non-chronic impairments of short duration, with little or no long term or permanent impact are usually not disabilities." (*Id.*, quoting *Sanders v. Arneson Prod., Inc.*, 91 F.3d 1351, 1354 (9th Cir. 1996). Defendants observe that in *Sanders*, the Ninth Circuit concluded "a four-month psychological impairment did not qualify as a 'disability' under the ADA." (*Id.*) Similarly,

Defendants observe district courts in the Ninth Circuit previously concluded temporary conditions did not qualify as disabilities under the ADA. (*Id.*, citing, *Johnson v. City & Cty. of San Francisco*, 2001 WL 263298, at *4 (N.D. Cal. Mar. 8, 2001) [hernia was temporary condition that did not qualify as a "disability"]; *Stubbs v. Johnson*, 2009 WL 187914, at *2 (E.D. Wash. Jan. 26, 2009) [temporary ankle injury did not qualify as a "disability" under the ADA]; *Wride v. Fresno Cty.*, 2013 WL 5146445, at *5 (E.D. Cal. Sept. 12, 2013).)

Significantly, each of the cases cited by Defendants applied standards under the ADA prior to its amendment in 2008, which "broadened the definition of 'disability.'" *See Dep't of Fair Empl. & Hous. v. Law School Admission Council Inc.*, 896 F.Supp.2d 849, 866 (N.D. Cal. 2012). Prior to the amendment, the Appendix to the ADA indicated: "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities." *Sanders v. Arneson Prods., Inc.*, 91 F.3d 1351 (9th Cir. 1996) (quoting 29 CFR Part 1630 App., § 1630.2(j) (1996)). Following the amendment, "nothing about the [ADA] or its regulations suggests a distinction between impairments caused by temporary injuries and impairments caused by permanent conditions." *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 333 (4th Cir. 2014). Indeed, this Court explained in *Wride*—a case cited by Defendants for the proposition that a temporary impairment cannot qualify under the ADA—that it was "constrained to evaluate Plaintiff's ADA claim based on the law in 2004," but following the amendment of the ADA, "[t]he result may well have been different." *See Wride*, 2013 WL 5146445 at *5.

Moreover, the medical record indicates Munoz had a history of *chronic* bilateral knee issues. (*See* Doc. 58-4 at 40-41.) Taking reasonable inferences in favor of Munoz with the affidavit and medical record, as the Court must do at this juncture, Munoz experienced an impairment of sufficient duration under the ADA.

b. *Major life activity*

Munoz contends he had difficulty with climbing "due to the condition of [his] knees." (Doc. 61-2 at 4.) Pursuant to the ADA, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* §

12102(2)(A). However, this list is non-exhaustive and clearly invokes a broad range of activities. This Court and others determined climbing also qualifies as major life activity. *See, e.g., Munoz v. Cal. Dep't of Corr. & Rehab.*, 842 Fed App'x 59, 61 (9th Cir. 2021) (not indicating error with this Court's determination that climbing was a major life activity, but rather erred with the standard used to evaluate the degree of limitation with the activity); *Mahon v. Crowell*, 295 F.3d 585, 591 (6th Cir. 2002) (considering the plaintiff's ability to climb as one of the identified "major life activities"); *see also D.R. v. Antelope Valley Union High Sch. Dist.*, 746 F.Supp.2d 1132, 1146 (C.D. Cal. 2010) (acknowledging "climbing stairs" was a major life activity). Further, as Munoz observes, "[t]hat climbing is a major life activity is undisputed" by Defendants. (Doc. 88 at 4.) Accordingly, Munoz has identified a major life activity within the meaning of the ADA.

          *c.*        *"Substantially limits" requirement*

In enacting the ADA, Congress specifically directed that the term "disability" should "be construed in favor of broad coverage." 42 U.S.C. § 12102(4). Thus, the "substantially limits" requirement "is not meant to be a demanding standard." *Bresaz v. County of Santa Clara*, 136 F. Supp. 3d 1125, 1134 (N.D. Cal. 2015). Rather, the Ninth Circuit observed the "regulations add that 'substantially limits' should 'be construed broadly' and that '[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.'" *Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 436 (9th Cir. 2018) (quoting 29 C.F.R. § 1630.2(j)(1)(i) and (ii)); *see also Munoz*, 842 Fed App'x at 61 ("Congress specifically "reject[ed] the standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), that the terms 'substantially' and 'major' in the definition of disability under the ADA 'need to be interpreted strictly.'" [Doc. 80 at 2].)

As the Ninth Circuit observed, according following the 2008 amendment, the corresponding regulations indicated "'[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.'" *Weaving v. City of Hillsboro*, 763 F.3d 1106, 1112 (9th Cir. 2014) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)). Evaluating whether an identified impairment is substantially limiting "requires an individualized assessment." 29 C.F.R. § 1630.2(j)(1)(iv).

Notably, a plaintiff's testimony coupled with supporting medical records can be sufficient to survive summary judgment on the issue of "substantial limitation." *See Davis v. Ma*, 848 F.Supp.2d 1105, 1114 (C.D. Cal. 2012); *see also Rohr*, 555 F.3d at 858-59. For example, the Central District found in *Davis* that the plaintiff's declaration supported by a letter from a doctor and prescription were sufficient to create a triable issue of fact. *Id.*, 848 F.Supp.2d at 1114. The court observed:

> Plaintiff explains the history of his back condition, describes the pain he experiences as a result of the condition, and states in his declaration: "Due to my degenerative back problems I have difficult[y] walking and sleeping." (Davis Decl. ¶ 2.) Plaintiff also provides a letter from his doctor, which states that Plaintiff "suffers from [a] severe back disability," and a prescription note stating Plaintiff has "severe back pain/ disc degeneration." (Davis Decl. Ex. 1.)

*Id.* The court found: "While Plaintiff's declaration borders on conclusory, the doctor's note tilts the balance in favor of finding a triable issue of fact exists … regarding Plaintiff's disability." *Id.* Therefore, the Central District court concluded that "viewing the facts in a light most favorable to Plaintiff, a reasonable jury may conclude from this evidence that Plaintiff's symptoms significantly restricted him from at least one major life activity such as sleeping or walking." *Id.*

Similarly, Munoz provided a declaration and supporting medical evidence indicating difficulty with climbing. Munoz explained the history of his knee problems and surgical procedures in his declaration. (Doc. 61-2 at 2, ¶ 2.) Munoz also stated climbing posed a risk "due to the condition of his knees," which would "lock up in certain circumstances, including while climbing." (*Id.*) In addition, Dr. Toor indicated in his treatment notes that Munoz had a history of chronic bilateral knee pain. (Doc. 58-4 at 44, *see also id.* at 65 [indicating a history of "chronic episodic knee pain"].) Dr. Toor indicated Plaintiff had left knee early arthritis in 2014, and he recommended a trial of local steroids. (*Id.* at 65.) Munoz also received a prescription for Ibuprofen 800mg and chronos for knee braces from healthcare professionals at Valley State Prison. (*See, e.g., id.* at 40-41, 44, 49, 88; *see also* Doc. 58-4 at 296.) Taking this declaratory and medical evidence in the light most favorable to Munoz, a factfinder may conclude Munoz's knee impairments restricted him from climbing. *See Davis*, 848 F.Supp.2d at 1114; *Rohr*, 555 F.3d at 858-59. Consequently, there is a material dispute of fact as to whether Munoz's impairment substantially limited him engaging in a major life activity, and Defendants' motion for summary adjudication of the claim is denied on this basis.

### 2. Discrimination by reason of disability

Defendants argued summary judgment was appropriate because Munoz was "not complaining that he was treated worse because of his disability." (Doc. 58-1 at 9.) According to Defendants, Munoz also did not "complain[] of being excluded from any program, service, or activity, on account of his alleged disability." (*Id.*) Therefore, Defendants argued "Munoz cannot state a claim under the ADA or the RA." (*Id.* at 10.)

Contrary to Defendant's assertions, however, Munoz alleged that "Defendants discriminated against [his] disability in violation of the ADA … *by denying him an accommodation* so that Plaintiff could safely participate in the housing program." (Doc. 7 at 17, ¶ 102, emphasis added.) Notably, a correctional facility's "deliberate refusal" to accommodate disability-related needs violates the ADA and the RA. *See United States v. Georgia*, 546 U.S. 151, 157 (2006). Such accommodations for inmates include "accessible beds." *Armstrong v. Brown*, 732 F.3d 955, 957 (9th Cir. 2013). Because Munoz asserted "he was denied an accommodation for his disability" at Valley State Prison, the Ninth Circuit concluded that "Defendants are … not entitled to summary judgment on the issue of whether they discriminated against Munoz by reason of his disability." (Doc. 80 at 4.)

### 3. Deliberate indifference

As noted above, deliberate indifference under the ADA "requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Duvall*, 260 F.3d at 1139 (citations omitted). "When the plaintiff has alerted the public entity to his need for accommodation … , the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Id.* Once an accommodation request is received, the public entity "is required to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation." *Id.* "A denial of a request without investigation is sufficient to survive summary judgment on the question of deliberate indifference." *Updike v. Multnomah County*, 870 F.3d 939, 954 (9th Cir. 2017) (citing *Duvall*, 260 F.3d at 1140).

Defendants argued they are entitled to summary judgment because Munoz fails to show deliberate indifference. (*See* Doc. 58-1 at 8-11.) Although this Court did not address the issue, the Ninth Circuit considered the merits of Defendants' argument on appeal. (Doc. 80 at 4-5.) The Ninth

14

Circuit found:

> The evidence presented by Munoz creates a triable issue of fact as to whether Dr. Meissner-Frisk conducted an adequate "fact-specific" inquiry into Munoz's disability. [] Dr. Meissner-Frisk never examined Munoz's knees before rescinding his chrono, nor did she conduct a patient interview. She testified that a medical doctor would want to conduct a physical exam before deciding whether to grant or rescind a low-bunk chrono. She also testified that she relied on medical records to make her decision, which were the same records that prior physicians used to grant Munoz's chrono. The medical records were filled with many references to serious knee injuries, prior knee surgeries, and knee pain. The medical records reflected X-rays that described Munoz's knees as "normal," yet Dr. Meissner-Frisk and Munoz's expert, Dr. Bruce Ellison, both opined that X-rays were not certain to reveal the type of knee injuries of which Munoz complained.

(*Id.* at 5.) The Court concluded that "[b]ecause the question whether Dr. Meissner-Frisk conducted an adequate inquiry turns on disputed material facts, Defendants are not entitled to summary judgment as to that issue." (*Id.*)

## C.     General Negligence

In the Second Amended Complaint, Munoz stated a claim for "general negligence" against Dr. Meissner-Frisk. (Doc. 7 at 18.) Previously, the Court declined to exercise supplemental jurisdiction over the negligence claim after granting summary judgment as to the federal claims. (Doc. 65 at 19.) Because the basis for dismissal is now obviated, the Court exercises its discretion and reinstates the negligence claim. *See Sola v. Wash. Mut. FA*, 201 Fed. App'x 409 (9th Cir. Sept. 7, 2006) (indicating that the district court may revisit the issue of supplemental jurisdiction over dismissed state claims after federal claims are reinstated); *Comm. Concerning Cmty. Improvement v. City of Modesto*, 2010 WL 3397421 at *1-2 (E.D. Cal. Aug. 27, 2010) (noting "the Court declined to exercise supplemental jurisdiction over plaintiffs' state law claims once judgment was entered on the federal claims," but following remand from the Ninth Circuit, the district court "exercised its discretion for supplemental jurisdiction and reinstated the state law claims previously dismissed").

To establish a claim for negligence, Munoz "must establish four required elements: (1) duty; (2) breach; (3) causation; and (4) damages." *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1203 (9th Cir. 2003). In general, "the plaintiff must show that the defendant owed a duty to the plaintiff." *See John B. v. Superior Court*, 38 Cal. 4th 1177, 1188 (2006). "Whether a defendant owes a duty of care is a question of law." *Burgess v. Superior Court*, 2 Cal. 4th 1064, 1072 (1992). With claims related to medical

professionals and malpractice, "expert testimony is required to 'prove or disprove that the defendant performed in accordance with the standard of care' unless the negligence is obvious to a layperson." *Johnson v. Superior Court*, 143 Cal.App.4th 297, 305 (2006).

Defendants acknowledge that "Dr. Meissner-Frisk owed Plaintiff a duty of care as his treating physician to screen him for proper housing according to his existing medical condition and to diagnose his knee injury." (Doc. 58-1 at 12.) However, Defendants assert Munoz "failed to provide sufficient factual allegations supporting a negligence claim against Dr. Meissner-Frisk." (*Id.*) Defendants argue:

> Plaintiff cannot show that the rescission of the low-bunk chrono was a violation of the duty to use such skill, prudence, and diligence as other members of her profession commonly possess and exercise, or that it caused him harm. Although Dr. Meissner-Frisk rescinded the low-bunk chrono, she had observed and evaluated Plaintiff before the rescission, and had reviewed his medical records. Plaintiff's medical records showed that none of Plaintiff's knee x-rays were abnormal, and all of Plaintiff's previous physicians had determined that Plaintiff's knee examinations had been normal. (DUF 55.) In addition, Plaintiff was able to play sports without difficulty. (*Id.*)

(Doc. 58-1 at 12.) In addition, Defendants argue Munoz fails to show causation because "there is no indication that rescission of Plaintiff's low-bunk chrono caused him harm," and he "cannot show he suffered an injury when he allegedly fell from the bunk bed." (*Id.* at 12-13.) Defendants contend that while an "MRI initially indicated that he had a torn ACL, … subsequent evaluation by an orthopedic surgeon found that Plaintiff did not have an ACL tear, but rather, mild degenerative joint disease and a small meniscal tear." (*Id.* at 12; *see also* Doc. 58-4 at 135, Doc. 61-2 at 63.) Defendants note "the orthopedic surgeon also found that the medial meniscal tear shown on the MRI was "not relevant and probably reflects previous surgery." (*Id.*; *see also* Doc. 61-2 at 63.) Defendants observe that after Munoz was released from prison, he worked as a journeyman electrician. (*Id.* at 13.) Defendants assert that after suffering a fall at work, Munoz "told his treating physician that he had no prior injury to his right knee before being injured on the job." (*Id.*; *see also* Doc. 58-4 at 275, 279.) Thus, Defendants conclude Munoz "cannot show that he suffered an injury when he allegedly from the bunk." (*Id.*)

On the other hand, Munoz argues Dr. Meissner-Frisk did not satisfy her duty to properly evaluate Munoz's reported knee injuries. (Doc. 61 at 11.) Munoz notes that Bruce Ellison, M.D., asserted "a physical examination and interview are required to diagnose a person's physical condition." (*Id.*, citing PX5 Expert Report p. 5 [Doc. 61-2 at 152].) Munoz contends there is "[n]o evidence" that

16

Dr. Meissner-Frisk" either interviewed him or examined his knee prior to rescinding his low bunk chrono July 31, 2015. (*Id.* at 11-12.) The following day, Munoz fell from a bunk bed. (Doc. 61-2 at 5, ¶ 13.) Further, Munoz contends the MRI reviewed by the orthopedic surgeon, Dr. Lovett, was not the correct one, as the notes from Dr. Lovett indicate he reviewed an MRI dated November 23, 2015. (Doc. 60 at 6; *see also* Doc. 61-2 at 63.) Munoz had an MRI for his right knee on September 28, 2015, and the results were reviewed with him on October 5, 2015. (Doc. 61-2 at 57; Doc. 58-4 at 135.) Munoz was informed the MRI indicated an "ACL tear and medial and lateral menisci tears." (Doc. 58-4 at 135.) Munoz contends the orthopedic surgeon reviewed the wrong MRI, and instead viewed the later-taken MRI of his left knee from November 23, 2015, rather than his right knee. (Doc. 61 at 6-7; *see also* Doc. 61-2 at 58.)

Significantly, Dr. Meissner-Frisk testified that a physical examination would be something a physician would want to do before determining the necessity for a low bunk chrono. (Doc. 61-2 at 118, Depo. 39:1-4.) However, it is undisputed that Dr. Meissner-Frisk did not examine Munoz's knees, and she did not conduct a patient interview prior to revoking the chrono. (Doc. 58-6 at 3, ¶ 8; *see also* Doc. 80 at 5.) As the Ninth Circuit found, "the question whether Dr. Meissner-Frisk conducted an adequate inquiry turns on disputed material facts." (Doc. 80 at 6.) Further, there are disputed facts regarding whether Munoz suffered an injury to his right knee—including an ACL tear and menisci tear identified in the MRI from September 2015—while using an upper bunk the day after the chrono was revoked. Because Defendants fail to show an absence of disputed material facts, Dr. Meissner-Frisk is not entitled to summary adjudication of the third cause of action for negligence.

### D. Qualified Immunity

Defendants assert they are entitled to qualified immunity, which protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The doctrine of qualified immunity "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they

perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Defendants have the burden to prove that officers are entitled to qualified immunity. *Moreno v. Baca,* 431 F.3d 633, 638 (9th Cir.2005).

The threshold inquiry to a qualified immunity determination is whether the facts alleged, when taken in the light most favorable to the plaintiff, demonstrate that the official's conduct violated a statutory or constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the alleged conduct would not be considered a violation, the inquiry stops, and the defense of qualified immunity applies. *See id.* However, if a constitutional violation occurred, the Court must next determine whether the statutory or constitutional right was "clearly established." *Id.* For a right to be clearly established, it must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

As discussed above, with the evidence taken in the light most favorable to Munoz, the evidence supports a finding that Defendants violated his rights under the ADA and RA by failing to provide an accommodation for an accessible bed. If the jury were to accept Munoz's testimony as true, Defendants would not be entitled to qualified immunity because both Title II of the ADA and Section 504 of the Rehabilitation Act apply to state prisons and he was entitled to an accommodate for a disability. *See Pennsylvania Dep't of Corr.*, 524 U.S. at 213; *Armstrong*, 124 F.3d at 1023. Indeed, the Armstrong Remedial Plan—cited by Defendants— was finalized on January 3, 2001, and "[t]he CDCR's compliance with the remedial plan has constantly been monitored by the court since that time." *See Roberts v. Cal. Dep't of Corr. & Rehab.*, 2014 WL 2109925 at *12 (E.D. Cal. May 20, 2014). Consequently, the Court finds the law was sufficiently clear that Defendants would understand failure to provide an accommodation to an inmate disabled within the meaning of the ADA and RA violated established rights. *See Maulden v. Gomez*, 2000 WL 1131875 at *2 (9th Cir. Aug. 9, 2000) (observing that "the obligation of California prison officials to comply with the ADA was clearly established"). Defendants fail to show they are entitled to qualified immunity.

## V. Conclusion and Order

Defendants have not carried the burden to show an absence of a genuine issue of material fact related to the second and third causes of action, for violations of the ADA and Rehabilitation Act

against the CDCR and negligence against Dr. Meissner-Frisk.  A jury must make credibility determinations and resolve the conflicts between the evidence.  *See Celotex*, 477 U.S. at 323; *T.W. Electrical Serv., Inc*., 809 F.2d at 630. Based upon the foregoing, the Court **ORDERS:**

1. Summary adjudication of the second cause of action for a violation of the Americans with Disabilities Act and Rehabilitation Act is **DENIED**;
2. Summary adjudication of the third cause of action for negligence is **DENIED**; and
3. The parties are directed to file a joint status report within 21 days that addresses what, if any, proceedings the parties believe to be required prior to setting a trial date; the length of trial requested; whether settlement efforts may be fruitful and indicating parties' trial date availability.

IT IS SO ORDERED.

Dated:   **January 20, 2022**

*Jennifer L. Thurston*
UNITED STATES DISTRICT JUDGE